[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
DECEMBER 19, 2001
THOMAS K. KAHN
CLERK

_____

No. 00-10154

_____

INS No. A76-957-148

RAFAEL BARRETO-CLARA,

Petitioner,

versus

THE U.S. ATTORNEY GENERAL,
IMMIGRATION AND NATURALIZATION SERVICE,

Respondent.

_____

Petition for Review of an Order of the
Board of Immigration Appeals

_____

**(December 19, 2001)**

Before BARKETT, HILL and KRAVITCH, Circuit Judges.

HILL, Circuit Judge:

Petitioner Rafael Barreto-Claro (Barreto), a native and citizen of Cuba, seeks our review of a final order of removal issued by the Board of Immigration Appeals (Board). His case represents an issue of first impression in this circuit and apparently all others concerning the filing of frivolous asylum applications under 8 U.S.C. § 1158 (d)(6), as rewritten by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Pub. L. No. 104-208.

Upon our review of the administrative record, we conclude that Barreto knowingly filed a frivolous asylum application as defined under Section 1158(d)(6) and its corresponding regulation, 8 C.F.R. § 208.18. We also find the evidence Barreto presented insufficient to prove the merits of his claim for asylum in order to withhold deportation. Based upon the following, the Board's final order of removal, dismissing Barreto's appeal, is affirmed.

I.

The facts are simple. Until he was accused of improper conduct as an American sympathizer and expelled, Barreto was an active member of the Cuban Communist Party from 1982 until 1985. More recently, for four consecutive years, Barreto applied to the American Interests Section of the United States government

2

in Havana for a tourist visa to enter the United States legally.  Each time he was denied on the basis that he was "a possible immigrant."[1]

Barreto then decided he must travel to the United States in an illegal, more circuitous, way.  In February 1998, by fraudulently claiming he had immediate family in Costa Rica, and, by paying a $4,000 bribe to a corrupt Cuban official at the Havana airport, Barreto obtained a visa from the local Costa Rican Consulate.[2]  Using this visa, he received a Cuban passport and left the country in February 1998.  Six months passed and Barreto was still living in Costa Rica when he became concerned to learn that the Costa Rican government planned to verify all visas issued to Cubans from November 1997 to March 1998, and that his visa was "under supervision."[3]

Fearing discovery and deportation by the Costa Rican immigration officials, Barreto arranged, for $5,000 paid to professional smugglers, to fly to Atlanta.  The smugglers told him to lie about the origin of his Costa Rican flight.  Fearing

---

[1]Many members of Barreto's family were already in the United States, legally or illegally.

[2] This visa is described as an A-9 visa given for refugee and humanitarian status in Costa Rica, generally based upon the existence of a relative living in that country.  Barreto allegedly lied about a brother living in Costa Rica.

[3] From the record it appears that Barreto took preliminary steps while in Costa Rica to convert his temporary status under the A-9 visa to permanent resident status.  However, he did not pursue this process, after he failed to appear at a scheduled interview, as he apparently was afraid of being returned to Cuba once his fraud was uncovered by Costa Rican officials.

retribution if he betrayed the smugglers, and thousands of dollars in fines for the airline, Barreto agreed.

Upon Barreto's arrival at Hartsfield Airport in August 1998, he applied to the Immigration and Naturalization Service (INS) for admission to the United States. He possessed no valid unexpired immigrant visa, unexpired passport or any other suitable travel document or identity and nationality document. Barreto was detained and charged with being removable under 8 U.S.C. § 1182(a)(7)(A)(i)(I) for lack of proper documentation. In a sworn statement executed before an airport immigration officer, Barreto concealed the fact that he had lived in Costa Rica for six months, instead claiming that he had flown directly from Cuba to the United States, with a brief stopover in some unknown Latin American country.

## II.

The INS began formal removal proceedings against Barreto. In September 1998, Barreto submitted his first asylum application, signed by his attorney. Part A, no. 22 of the application inquires "Have you ever applied to the United States Government or to any other Government(s) for refugee status, asylum, withholding of deportation, or withholding of removal?" Barreto marked the box "NO." At Part C, no. 7 of the application, Barreto was asked to detail his trip to the United States. He made the following false statement:

4

I left Cuba on a Cuba national airline flight. I was taken to another country, but I don't know which one. At the airport in that Country I was taken to an airplane bound for the United States. I was not told the names of anyone who helped me leave Cuba or the names or locations of my transit point. I had never flown in an airplane and was very nervous, so I did not hear our destination or see exactly where it was.

Five months later, in February 1999, Barreto filed a second revised application, also signed by his attorney. This time, in reference to Part A, number 22, Barreto marked the box "Yes," and indicated that he had been granted some form of refugee status in Costa Rica, but that it had been based upon incorrect information. This time, in reference to Part C, number 7, Barreto told the truth about his circuitous journey from Cuba to the United States.

At a merit hearing held before an immigration judge (IJ), Barreto testified about the history of his family life in Cuba, his three-year association with the Communist Party, his persecution upon his expulsion from the party,[4] his fears of future persecution, arrest and torture should he be forced to return to Cuba, and the

---

[4] Barreto claims he was expelled from the Cuban Communist party for associating with his sister-in-law, a Cuban-American. As a result, he claims that he became a common citizen and was isolated. After his expulsion, Barreto lost his job as a taxi driver and was forced to rent his house out to foreign tourists while he lived in a shack next to the house, his telephone calls were monitored, he was subjected to searches for prohibited foods, and he rejected the only job offer he had, that of gravedigger.

5

fact that his family was in the United States with no close relatives left in Cuba.[5]

He also testified that he lied on his initial asylum application out of fear for the

smugglers.[6]  Barreto's testimony was consistent with the statements made on his

second amended asylum application.[7]

## III.

In his opinion, while sympathetic, the IJ found Barreto to have filed a

frivolous asylum application and be removable as charged.  He determined that

Barreto was not a sincere asylum applicant but merely using the issue of asylum as

a ruse in an attempt to reunite with family members already present in the United

States.  In addition, based upon multiple frauds committed, the IJ found Barreto to

be incredible.  On the merits, the IJ found that Barreto had not established either

past persecution in Cuba or the requisite well-founded fear of future persecution.

---

[5] The administrative record contains, and counsel for Barreto affirms, that Barreto received  two notices warning him that the filing of a frivolous asylum claim would cause him to be permanently barred from any relief under the Immigration and Nationality Act (INA).  The notices define a frivolous application as "one which contains statements or responses to questions that are deliberately fabricated."  At the preliminary and merits hearings, the record is clear that the IJ also gave Barreto one, perhaps, two oral warnings of the consequences of filing a frivolous application.

[6] At Barreto's merit hearing, an associate professor at the University of Louisville, with a doctoral dissertation on Cuba, testified on his behalf as an expert witness as to the risk of persecution should Barreto be returned to Cuba.

[7] At the merit hearing, a Costa Rican government official was consulted by telephone. The question of whether Barreto might have achieved permanent residence in Costa Rica, despite this fraud in obtaining the A-9 application, was not resolved.

The Board upheld the finding by the IJ that Barreto had knowingly filed a frivolous asylum application based upon responses to numbers A.22 and C.7 that were false, knowingly and deliberately made, and material. *See* 8 U.S.C. § 1158 (d)(6).[8] It examined the facts surrounding Barreto's travel to the United States after a six-month stopover in Costa Rica. It noted that, while in Costa Rica, Barreto had taken preliminary steps to convert his temporary status to permanent status, but abandoned the idea out of fear for the fraud he had committed. The Board also noted that the IJ could not resolve the question of whether Barreto might have been granted permanent residence in Costa Rica, despite his fraud. In affirming the decision of the IJ, the Board found that, as the fabrications on Barreto's asylum application related to the issue of firm resettlement in Costa Rica, he had made a frivolous application under the terms of the statute. *Id.*

The Board also upheld the IJ's finding that Barreto had not met his burden of proof to establish asylum, as he had proved neither past persecution or a well-founded fear of future prosecution if returned to Cuba and dismissed his appeal. *See INS v. Elias-Zacarias*, 112 S.Ct. 812 (1992). Shortly thereafter, Barreto filed a petition for review with this court.

---

[8] Based upon the regulation promulgated to implement Section 1158 (d)(6), the Board confirmed that Barreto had received proper notice warnings and that these material fabrications, made after notice was received, could not be corrected through recantation. *See* 8 C.F.R. § 208.18.

IV.

We review *de novo* the statutory interpretation finding by the Board that

Barreto filed a frivolous asylum application under Section 1158(d)(6). *See*

*Perlera-Escobar v. EOIR*, 894 F.2d 1292, 1296 (11th Cir. 1990); *Castano v. INS*,

956 F.2d 236, 238 (11th Cir. 1992). This plenary review, however, is tempered

with deference to the Board. *See Perlera-Escobar*, 894 F.2d at 1296 (we are

obliged to defer to the Board's interpretation of the applicable statute when the

interpretation is reasonable).

As to the merits of Barreto's claim for asylum, we review the administrative

record on which the order of removal is based to determine whether the evidence

presented was so compelling "that no reasonable factfinder could fail to find the

requisite fear of persecution." 8 U.S.C. §§ 1252(b)(4)(A) - (B); *see Elias-*

*Zacarias*, 112 S.Ct. at 483-84.

V.

*A. Frivolous Application*

Section 1158(d)(6) reads:

> If the Attorney General determines that an alien has **knowingly made** a frivolous application for asylum and the alien has received the

notice under paragraph (4)(A)[9], the alien shall be permanently ineligible for any benefits under this chapter, effective as of the date of a final determination on such application.

8 U.S.C. § 1158(d)(6)(emphasis added).

The definition of frivolous application is set forth in the corresponding regulations:

> For applications filed on or after April 1, 1997, an applicant is subject to the provisions of [Section 1158(d)(6)] only if a final order by an immigration judge or the Board of Immigration Appeals specifically finds that the alien **knowingly filed** a frivolous asylum application. For purposes of this section, **an asylum application is frivolous if any of its material elements is fabricated**. Such finding shall only be made if the immigration judge or the Board is satisfied that the applicant, during the course of the proceedings, **has had sufficient opportunity to account for any discrepancies or implausible aspects of the claim.**

8 C.F.R. § 208.18 (emphasis added). The regulations go on to state that "[a]n alien is ineligible for asylum if he has firmly resettled in another country prior to his arrival in the United States. *See* 8 C.F.R. § 208.13 (c)(2)(B). This regulation, mandating denial of asylum in the United States, supports the doctrine of common sense, as an alien who has resettled somewhere else is no longer in flight from persecution or in need of refuge here. *See Abadalla v. INS*, 43 F.3d 1397, 1399-

---

[9] Section 1158 (d)(4)(A), entitled 'Notice of privilege of counsel and consequences of frivolous application,' states that "[a]t the time of filing an application for asylum, the Attorney General shall (A) advise the alien of the privilege of being represented by counsel and of the consequences, under paragraph (6), of knowingly filing a frivolous application for asylum."

1400 (10th Cir. 1994)(an alien cannot bootstrap his asylum claim by unilaterally severing his ties to a third country who gave him initial refuge).

Barreto filed two asylum applications, one in September 1998, and one in February 1999, two days before his scheduled merits hearing.[10]  On his first application, he stated falsely that he had never before applied for refugee or asylum status.  He compounded this falsehood with a fraudulent narrative of how he came to the United States.  We agree with the interpretation of the statute by the Board that Barreto fabricated his answers in a knowing and deliberate manner.  *See* Section 1158(d)(6).  We also agree with the Board's interpretation of the regulations that the fabricated answers were material to Barreto's case as they related to his six month stopover in a third country, Costa Rica.  *See* 8 C.F.R. §§ 208.18, 208.13(c)(2)(B).

Here, after Barreto was warned, he recanted the false answers to numbers A.22 and C.7.  We agree that a finding of frivolous shall only be made if the IJ or Board is satisfied that Barreto had sufficient opportunity to account for any discrepancies or implausible aspects of his claim for asylum.  *See* 8 C.F.R. § 208.18.  Here, rather than showing that his fabrications were neither material nor

---

[10] It is undisputed that Barreto received the requisite notice under Section 1158(d)(4)(A).

10

knowingly made, Barreto appears to be explaining, as the Board noted, "why concededly material fabrications were knowingly made."

Under our *de novo* review, we give due deference to the Board's strict, no tolerance statutory interpretation, that applicants must tell the truth or be removed. This policy best supports the statute's underlying purpose, as implemented by the regulations, of discouraging frivolous applications.[11]  The decision by the Board that Barreto filed a frivolous application is affirmed.  *See Stinson v. United States,* 113 S.Ct. 1913, 1919 (1993) ("As we have often stated, provided an agency's interpretation of its own regulation does not violate the Constitution or a federal statute, it must be given 'controlling weight unless it is plainly erroneous or inconsistent with the regulation.'"); *Perlera-Escobar*, 894 F.2d at 1296.

*B.  Merits of Claim for Asylum*

Section 1158(a) of the Act authorizes the Attorney General, in his discretion, to grant asylum to an alien who is "refugee" as defined in the Act, *i.e.*, an alien who is unable or unwilling to return to his home country "because of persecution

---

[11]  Synonyms for frivolous are "carefree, fanciful, fickle, giddy, flippant, nonchalant." Roget, International Thesaurus (3d ed.1965).   The dictionary defines frivolous as "insignificant, trivial, silly or gay."  Webster, New International Dictionary (3d ed. 1961).  We note perhaps that the statute is improperly captioned as "Frivolous Application."  A more appropriate caption perhaps would be "Fraudulent Application."  Here we think that the record very clearly reflects that Barreto was sincere, albeit fraudulent, in his application.  He was not nonchalant or flip. Neither was it insignificant or trivial to him.

or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." *See* 8 U.S.C. §§ 1101(a)(42)(A), 1158(a). Here the Board found that Barreto had not established that he suffered past persecution or had a well-founded fear of future persecution under the Act. *Id.*

The Board's determination that Barreto was not eligible for asylum must be upheld if "supported by reasonable, substantial, and probative evidence on the record considered as a whole." 8 U.S.C. § 1105a(a)(4); *Elias-Zacharias*, 112 S.Ct. 812, 815 (1992). It can be reversed only if the evidence presented by Barreto was such that a reasonable factfinder would have to conclude that the requisite fear of persecution existed. *Id.*

The Board found that the experiences described by Barreto did not rise to a level of persecution, past or future. We agree.

As to past persecution, the record reflects that Barreto was not physically harmed in Cuba, neither was he ever arrested or detained. At most, the evidence presented reflects that when Barreto fell out of favor with the Communist Party, he suffered employment discrimination, lost his job as a taxi driver and was forced to take menial work. This type of employment discrimination which stops short of depriving an individual of a means of earning a living does not constitute

12

persecution. *See Zalega v. INS*, 916 F.2d 1257 (7th Cir. 1990); *Youssefina v. INS*, 784 F.2d 1254 (5th Cir. 1986).

As to future persecution, Barreto claims that his anti-Castro political opinion makes him susceptible to persecution and possible torture upon his return. Barreto's expert witness testified that he "will be in serious trouble when he returns," and would be "incarcerated or very seriously marginalized" in light of his leaving Cuba illegally and his political opinion. Other than this opinion testimony, there is no further evidence in the record to support this theory. Prosecution for violating Cuba's travel laws is not persecution within the meaning of the Act. *See Janusiak v, INS*, 947 F.2d 46 (3d Cir. 1991).

We conclude that the Board's determination that Barreto was not eligible for asylum is supported by reasonable, substantial, and probative evidence on the record which we have considered as a whole. *Elias-Zacharias*, 112 S.Ct. at 815. Barreto failed to produce such sufficient evidence that a reasonable factfinder would have to conclude that the requisite fear of persecution existed. *Id.*

## VI.

The order of the Board dismissing Barreto's appeal is

AFFIRMED.

BARKETT, Circuit Judge, concurring in the judgment.